Mr. Crockett. Thank you. Good morning, members of the panel. Robert Crockett for the Defendants and Appellants. Your Honor, I would submit that the court's, the district court's failure to defer to the court transcends a lot of the problems here. It's part of the jurisdictional problem. It's part of the procedural abuses that occurred here. The district court should have acknowledged and deferred to the specialized role of the Corps in these proceedings. And it seems that the plaintiff doesn't really understand that role. And in the reply brief to the contempt proceedings, they basically said, what is the big deal about the Corps' expertise in wetlands regulation? The Corps doesn't have any particular expertise in wetlands regulation. The court does. And I think that anybody who's had sufficient experience with Clean Water Act cases knows that the Army Corps of Engineers is the wetlands regulator. Counsel, I think one of your arguments was that the 60-day notices were inadequate. Is that right? That's correct. If you were to prevail on that, would that mean that no citizen suit could be brought under 404? That is incorrect, no, Your Honor. There are two kinds of 404 actions in this case, and I can break them into two pieces. One is an illegal wetlands bill. That's covered by Section 301. Under Section 301, if you don't have a permit, and in this case there was an expired permit, if you don't have a permit, when you read Section 301, a citizen has the right to sue for an illegal fill. It's when there is a permit, when a permit exists, or an order of the court, or something the court has done. The Corps issues an email, the Corps issues a letter, the Corps issues an order, the Corps issues a permit. That is not contained in Section 505 of the Clean Water Act. That's not authorized under the decisions we've cited. And this Court's own decision in Section, in the Preserved Endangered Areas, I'm sorry, it's, the Court, there's three district court decisions which have discussed the matter, and then there's the decision Preserved Endangered Areas of COBS history, which holds that there's no Section 505 jurisdiction over clean water actions against the Army Corps of Engineers. So, in answer to your question, there's only jurisdiction to challenge the illegal fill. Back to the deference issue. The deference issue is... So you're saying there is jurisdiction to challenge the illegal fill, even if their 60-day notices were not adequate? No, that's incorrect. If the 60-day notices are inadequate, then there is no jurisdiction, 505 or otherwise. And in this case, there were four 60-day notices. The first one... That's what I was asking about, actually. I was wondering if we even have to reach the question. Obviously, if there was no jurisdiction in the district court, that's just a fancy word for power. It means that the Court had no power to grant relief for violations in favor of a citizen. So I'm trying to find out first whether there was Clean Water Act jurisdiction. Well, if we look at Section 505 of the Clean Water Act, or Section 1365, it authorizes an action against any person who is in violation of an affluent standard or limitation. Mr. Brockett, I think we're on two different train tracks here. I think Judge Kleinfeld is asking a very simple question, and that is, you've got 60-day notices. If the notices were deficient, that is, the notices did not alert Marina or the Corps to violations of the Act, and if the district court lacked jurisdiction on that basis, does that end this case? Yes, it does. That's what I was trying to find out. Yes, it does. And so the more knocky question of Section 505 jurisdiction would never be reached by this Court if the 60-day notices were deficient. And were they? Yes, they were, Your Honor. There were four 60-day notices. The first ones allege fill below the ordinary high water mark of the lake, but they don't constitute a citizen suit. They have to establish some sort of affluent standard or limitation. They don't do that. Do you keep hinging it to whether there's a right to bring a citizen suit for a 404 violation? Correct. Okay. Unhinged from that, are the notices sufficient? The notices, unhinged from that, the notices, I think, are sufficient to say that there's fill occurring below the ordinary high water mark of the lake. Below, but not above. Below, not above, and certainly the notices don't even mention 402 violations, the violation of the NPDES permits. But neither the notices nor the complaint. That's correct. So it would be your position that, regardless of anything else, 402 claims, whatever they may have been, are out? That's correct. What are those claims? How can we distinguish, given the district judge's judgment, if we were to say 402 claims are out, but let's suppose 404 claims, at least some of them, are still alive? How would we unravel it? Everything above the ordinary high water mark of the lake is a 402 issue. Everything below is a 404 issue. Everything above the ordinary high water mark of the lake is covered by a 402 permit, which the district court found didn't exist, but it did exist, and we've documented it several which ways, including the notice of violation the Regional Water Quality Control Board issued. Those above the ordinary high water mark of the lake issues involve things like sealed curtains in the lake, even though that's below the lake, but that captures runoff from in the uplands area. It involves the alleged failure to stake hay bales correctly. It involves the alleged failure to install sediment basins correctly. So everything above the ordinary high water mark is just totally not described in the 60-day notice, but if we go back to the 60-day notice's sufficiency for below the ordinary high water mark of the lake, then you are in a Section 505 issue. Then the court would want to determine whether or not there is Section 505 jurisdiction against the Corps, but our position is, is that the only problem- I'm sorry. You said against the Corps? Did I say that? You said the court would have to decide whether there's Section 505 against the Corps. No, that's right. I'm not following that. No, I misspoke. I misspoke on that. Okay. So the question then becomes whether there is continuing jurisdiction on the 404 issues, and under the Gwaltney decisions, which we cite in our brief, both the Supreme Court decision and the remand to the Court of Appeals, there is no continuing jurisdiction. The district court originally, before Judge Reel, determined in the preliminary injunction that there was no continuing violation and could not issue an injunction on the basis of the Clean Water Act because there was no continuing violation. Now, I know that's not binding at the trial level when the trial finally occurs, but the reasoning is still the same. The last violation to occur, if one violation did occur, was when the fill was-when the dredging activity was terminated by the cease and desist order on June-July 23rd, 2003. Well, let me ask you this. If I understand part of the center's theory, it is that there is a forever violation here because having allowed pollutants to get into the water of the lake and not having done anything about that, even if you could, which I take it they're basically saying at some level you can't because the stuff has just become part of the lake out there. Is there any authority that that in itself would constitute a continuing violation such as to confer jurisdiction? Well, the Chesapeake Bay v. Gwaltney decision, which is the Fourth Circuit's decision in 1989, 890 F. Second 690, in that case there were two different kinds of violations. There was a TKN, which is a chemical compound violation, and then there was a chlorine violation. And the district court had to find there was continuing TKN contamination in the lake-in the waters of the United States that was running off from the project that hadn't been abated. The chlorine risk had been wholly past abated. And in this case, if we're talking only about the fill that occurred on July 23rd, 2003, that fill below the ordinary high water mark of the lake was completely cured by the Corps' ICMO order, which issued in 2003, the emergency permit that was issued in 2003, and then the Corps' later ICMO in 2005. Well, yes, but I take it, their theory, and I take it that the district court's finding or conclusion is otherwise. That is, that the cure wasn't effective, and in any event, once done, it was just done. Once the bottom of the lake was stirred up, it was stirred up and it slipped through the silt curtains because they weren't any good. And so that violation is still going on because at some level, Big Bear Lake is still mucked up because of the dredging. That particular kind of action is not permitted or not listed under Section 505, and that particular kind of violation is not mentioned in any of the 60-day notices. Well, it is. The December, I mean, the December notice basically kind of says that, you know, actions undertaken to date have not been the most effective measures to prevent sedimentation, but that there is ongoing illegal work. The clearer statement is the August one, that additional discharges, I mean, as I read it, the August notice acknowledges that the discharges occurred only through July 25th, but then it goes on to say additional discharges have occurred each day since because the large amount of earth moving and destabilization has resulted in piles of dredged and filled that are continuing to cause discharges below the ordinary high water mark of the lake. In other words, the pun is going to go on forever. That continuing violation issue, Your Honor, is not supported by the record in the sense that the court did not take into account the curative acts undertaken by the property owner in response to the various orders issued by the court. In fact, the court condemned those orders and criticized those orders and in findings said those orders were deficient because they merely advanced the project itself. The violations that, the only violations that the Army Corps determined existed are contained in the, are described in both the 2003 and the 2007 ICMO, and in those orders they just, all they said was there was discharge below the ordinary high water mark of the lake and there was an illegal road path that was constructed along the, below the ordinary high water mark of the lake. I'm not sure I'm following. I had thought that the theory was once you've changed the bottom of the lake, it remains changed, so the violation continues, and I thought the theory on the other side was that once they did the repairs that the Corps of Engineers authorized in its emergency permit in 2005, the Corps was repairing the silt curtains and deepening the dredge area and all that, that that satisfied the Corps that there was no further effect on the lake. That's correct. Have I got this right? That's correct. Is that all there is to that? If the Corps' finding is accepted? The Corps was satisfied with the, with Marina Point's activity here. Yes, but isn't the, but doesn't that have to speak as of the time the complaints filed? So what happened in 2005 wouldn't, wouldn't necessarily mean there was no continuing violation as of April 7, 2004, would it? Well, if there was a continuing violation as of April 2007, 2004, then automatically one would conclude that this case should never have been tried in the first place. If there were not a continuing violation as of that date. Right. What I'm saying is that the fact that the Army Corps of Engineers cleared you through the emergency permitting process in 2005 would not necessarily mean that there was no continuing violation as of the time the complaint was filed, would it, or does it? It would, because the Corps' ICMO letters in 2005 and 2007 don't mention any other violation. And one would have to assume that if the Corps' ongoing jurisdictional letters mention no other violation, and the only violations they mentioned were the ones that were committed in July of 2003, one would have to assume there were no other violations. It's not a violation to have done something physical that has lingering effects? That's not a violation? That is a violation. I would have thought so. So if the last act that, that one can point to occurred in what, July 23rd, but it had lingering consequence. Correct. But through April 7th, 2004, is there a continuing violation? No. Because? Because of the April 2004 terminus. By definition, there is no continuing violation. I'm sorry, say again. Because the district court found the last violation was in 2004, then whatever violation there was before that date is immaterial and irrelevant. And whatever violation, and there was no violation after that date that can't, that is subject to federal court jurisdiction. So there may have been a continuing violation up to 2004, but under the Gwaltney line of authorities, there can be no federal court jurisdiction after 2004 because there was no continuing violation. By the court holding that the last violation was 2004, it had no jurisdiction to try this case. Okay. I'll defer if I may, Your Honors.  Good morning, Your Honors. May it please the Court, Denise Kahn for Appelles. Let me start by clarifying what I believe are some of Mr. Crockett's misstatements. Could you talk a little louder? I'm having trouble here. Certainly. I just want to start by clarifying some of Mr. Crockett's, what I believe to be, misstatements. The court did not find that the last violation occurred on April 2004. That was simply the end of the penalty period, and presumably the court ceased to issue penalties after that point in time because that's when the TRO issued. So the court did not find there was no violation past April 2004. The 60-day notices in this case were entirely sufficient to vest jurisdiction in the Federal court, and there was sufficient notice of ongoing violations at the time the complaint was filed. Let me ask you a few questions about the notices. You sent out a number of them. The June 30th and the July 17th notices, let's suppose, were sufficient substantively in saying that there was an activity without a permit that was dumping a lot of junk into the lake. But all of that activity ceased with the cease and desist order on July 23rd, and, of course, there was no lawsuit filed within 60 days of that. Then you come up to an August notice, which, in effect, acknowledges that, and then goes on to say that there's some additional discharges because of the amount of earth moving and destabilization. And then you've got a December 1st notice, which complains only about work that was done on December 1st, and it says, well, look, you took a lot of actions that caused you to delay, and now you're past the deadline, which was December 1st. However, that permit was extended to December 30th. So my question basically is this. The first two notices may have been sufficient, but nothing came of them. The August notice is very vague, and the December notice has to do only with something that happened on December 1st, and does not give Marina Point reason to believe that it's doing, that it needs any corrective action, because it had a permit at that point. So long-winded question, but why under that scenario are any of the notices effective? Well, to begin with, each one of the notices refers back to each of the prior notices, and even the December notice. Well, yes, but the point is continuing conduct. It has to be the notice has to pertain to a continuing, present, current violation, not the stuff that happened two months ago or three months ago. Correct, Your Honor. And let me just look at my notes. In December of 2003, the notice states that Marina Point was not undertaking proper remediation measures, but it is instead proceeding forward with their illegal project. Footnote 1. Well, I don't know what that means. I mean, what does that mean? Well, what we say in the letter is that Marina Point did a lot of unnecessary dredging under color of the ICMO. But I don't understand what a lot of unnecessary dredging means. Well, what it means, Your Honor, what the evidence showed at trial was that the ICMO issued by the Army Corps authorized specific activities. The defendants did not complete the specific activities that the ICMO required and additionally engaged in other dredging activities not covered by the permit, not covered by any other permit. That's what it means when they were continuing their illegal project. And so when was that supposed to be? See, I just don't see anything specific in the December notice that would put anybody, including the Corps and Marina Point, unnoticed that they were doing anything wrong because they had a permit to keep working. They only had a permit to do certain things. And let's not forget that we contend also that we gave prior notice in the earlier letters that they were illegally grading and filling wetlands, which the ICMO did not address, Your Honor, in any way, so that at the time we filed the complaint, dredged material had been sitting in the wetlands and had never been removed. And under governing case law, the presence of that dredged material in wetlands is an ongoing violation. Well, that's assuming that they were wetlands. That's correct, which is what the Court found, Your Honor. Well, based on what? I mean, it just up and found it. There's absolutely no basis in the record for finding that that upland part of the project site was wetlands. In fact, everything, everything, it just seems like it's perfectly clear that the wetlands are adjacent to the project site. But what? There's nothing except your expert's unsubstantiated view, without conducting any kind of test, that this property was wetlands 50 years ago. Well, Your Honor, Dr. Prance testified. He visited the site. He found hydric soil. He found evidence of riparian vegetation. And it was clear that you can't perform a standard wetlands delineation any longer because the defendants had graded and filled the site. So Mr. Merkle couldn't have performed a standard wetlands delineation. Based on the evidence that we had, which wasn't properly contested at trial, the district court found, indeed, that because of the vegetation and the hydric soil, there was, in fact, wetlands on that site. And we even know from Mr. Merkle's report that wetlands have been emerging on the site since construction stopped. Now, Mr. Merkle, in his improper jurisdictional determination, says, well, that's just temporary ponding related. I thought what happened was there was a flood over the road. Are you saying that the floodwaters created wetlands that could not be alleviated? I'm saying the wetlands reemerged on site. Have reemerged on site in the last four years, Your Honor, since the defendants are no longer afraid. Are you talking about the flooding that occurred? I'm not specifically talking about the flooding, no. It may have resulted from the flooding. I don't think there's actually sufficient evidence in the record to make that determination. But there's another way that ongoing violations can be determined under this occurrence of intermittent or sporadic violations. And surely the evidence in this case is overwhelmingly indicative that the defendants simply disregarded the law and were going to continue to disregard the law. Well, let me back up to the notices for a minute. I think the idea of the notice is that the citizens group, or here it's, I guess, depending on the interests of the other homeowners around the lake from this condo development going in, can tell somebody who's violating the Clean Water Act, quit doing A, B, and C. And you have 60 days to start behaving yourself under the Clean Water Act or else we can sue you. And I'm not clear from the notices on exactly what they were supposed to quit doing at each of the four times. What the notices say is that you are grading and discharging fill into the waters and wetlands of the United States without any permits required under 301 and 404. Well, see, I know at least one time you wanted them, you said to them, you're violating the Clean Water Act. Stop all activity at a time when the Corps of Engineers had given them a permit saying we're satisfied that you can engage in certain activities and they will be in compliance with the Clean Water Act. So I'm wondering what a developer is supposed to do in the face of your notice and the Corps' permit to the contrary. The Corps has not issued a permit to Marina Point. It has never issued a 404 permit. After the expired 1992 permit, it issued an interim corrective measures order which specifically says this isn't a permit. You may or may not be able to maintain some of these corrections after we fully evaluate the session. No permit has ever been issued under 301 or 404 to Marina Point since the expiration of the 1992 order. Similarly, the January 2005 emergency order was issued at the request of the defendants because there's absolutely unrebutted evidence that this site just kept eroding into the lake from the stockpiled and dredged material, which is a continuing violation. Wasn't your notice telling them to stop doing what the Corps told them to do as a corrective measure? No. Our notice, if you're referring to our decision, the first notice is say you need permits from the Corps to do this work and you don't have them. Stop. The subsequent notice says the Corps has ordered you to take certain remedial measures, and apparently you haven't done that either. And that's what the unrebutted evidence is. That's what the Court found. So the interim corrective measures order isn't a permit, and it says so in there. And neither is the January 2005 order. I mean, and we know that because in June of 2004, the defendants submitted a new application for a 404 permit. They didn't have one. Does your case depend on concluding that the – that if they performed the interim corrective measures that the Corps had authorized, that when they did so they were nevertheless violating the Clean Water Act because they did not have a permanent effect when they performed the interim corrective measures? No, Your Honor. We're not – clearly the Corps directed them to take certain remedial activities in the ICMO, regardless of whether or not the Corps had issued a permit. I mean, essentially the site was in horrible shape and was polluting the lake. And before it decided whether or not they would issue a 404 permit, the Corps said, take these interim measures. Stop this pollution. And when we evaluate any subsequent permit application that you may submit, we'll decide then whether these measures can remain or not. That's literally what the ICMO says. So there's – it's not – there was never any misunderstanding, and couldn't have been, on Marina Point's part that that ICMO was a permit. Because the Army Corps clearly says it isn't. No. Again, with regard to the continuing violations, I mean, these defendants ignored the Corps, the Corps' directions early on after their permit expired in 2002. They threatened the Corps with liability for refusing to renew the permit. They told the U.S. Fish and Wildlife Service that they intended to violate the Endangered Species Act. They used a drag-line dredge when the Corps specifically told them not to. They didn't comply with the ICMO. They didn't do everything that the Corps told them to do to remediate the site in November of 2003. They didn't do everything the Corps told them to do when they remediated the site in January of 2005. And then, frankly, I think thereafter the judgment activities confirm their disregard for the law and support the Court's finding that they would simply have continued to violate the Clean Water Act. Let me ask you about perhaps a much simpler issue, the bald eagles. Is that moot because they're no longer a listed endangered species? I believe we agreed it was moot except as to our entitlement to attorney's fees earlier, which we don't believe is mooted by the delisting. And to what extent does it affect your entitlement to attorney's fees? We don't believe it does because under the Endangered Species Act, up until the day the bald eagle was listed, we furthered the purposes of the Act. We protected the bald eagle. We stopped the defendants from destroying their habitat. Even the remedial measures ordered by the Army Corps required bald eagle monitoring. And despite what the defendants say, at that point in time, the U.S. Fish and Wildlife Service had not made any determination at all about whether there would be a take of the bald eagle. All the evidence in the record is that the reason, part of the reason the Army Corps did even reissue a 404 permit is because it needed to reassess the site's impacts and the impact of the proposed work on the bald eagle. So let's see. You started your case before the bald eagles were delisted? Absolutely. And you got your injunction before they were delisted? Absolutely. And the Corps' even remedial 2005 order requires monitoring. So we essentially succeeded. We don't have to prevail under the Endangered Species Act, but we did succeed in furthering the purposes of the Act and protecting the bald eagle up until the day it was delisted. So we don't believe the delisting affects our entitlement to attorney's fees under the Endangered Species Act. Your Honor, let me also address some of Mr. Crockett's initial remarks about deference that might be owed to the Corps based on post-judgment jurisdictional determination. As we made clear in our contempt response brief, we don't believe that issue is properly before the Court. We don't believe there's any issue here of the Corps' jurisdiction. That issue was never raised by the defendants in their merits appeal. It wasn't challenged in the lower court. And in fact, the only evidence there is that the Court took any action with regard to determining the existence of wetlands is that that happened after entry of judgment in violation of the injunctions. Help me on something else. On the contempt penalties, did the District Court have jurisdiction to impose the continuing contempt citations even though it had generally lost jurisdiction of the case once it was on appeal to this Court? Yes, it did, Your Honor. Because all the contempt order does is maintain the status quo. The injunctions said you can't move forward with development of the property without court authorization. And they didn't, did they? They did. They continued to seek permits. That's not development, is it? Is that development of property, to seek permits? Well, they can't build on the property without the permits. That's not my question. Certainly you can't build without a permit, but how is it developing the property without a permit? We know it happens all the time. People get lot map, get map reports, get permits, and they never go around and develop it. Why is that developing it? Because it's part of the process of development. That is not what the injunction said. It said you can't develop it. And it said, and you must do whatever the Court tells you to do. Correct. That's all it said. Correct. Okay. And it did not. It what? The Marina Point didn't do so. Wait a minute. Were they just sending paperwork to government agencies asking for permission to develop, or were they moving dirt? They were not moving dirt, Your Honor, except in compliance with the remedial orders. So as far as moving dirt goes, no possible contempt there. The contempt is asking government agencies for permission. Well, yes and no. And let me back up one minute. They were moving earth beyond the scope of the remedial orders. So, yes, but that all occurred prior to the issuance of the injunction. Well, I'm asking about after the issuance of the injunction. I was asking about the contempt. Did they do anything that was in contempt of court in violation of the injunction in the nature of moving dirt, or is what they did after the injunction was issued in violation of the injunction asking government agencies for permission to do things? Well, there are multiple parts to the injunction. But they did not, as far as we know, develop the site in terms of actually building or moving dirt on the site. However, they were also ordered by the injunction to immediately restore the shorelines and the wetlands. And they certainly didn't do that. Instead, they went to the Army Corps and said, the court is all wrong. There are no wetlands anywhere on the site. We are not obligated to take any immediate action. Well, it's not entirely correct that that's what the injunction said. The injunction was immediately undertake remedial measures prescribed by the Army Corps of Engineers to repair and restore the integrity of the shoreline and wetlands. Correct. And the Army Corps of Engineers said, hey, there's no wetlands. No. They didn't go to the Army. But the court had already ---- Well, no. But that's the injunction. The injunction wasn't go in there yourself and take remedial steps, even assuming the district court's got that authority. Never mind that. The district court says go do it and go do what the Army Corps of Engineers tells you to do.  And the defendants, in response to that, didn't go to the Army Corps of Engineers with a proposed plan and say, here's how we propose to restore the wetlands in compliance with the court's order. The Corps of Engineers said, there are no wetlands. So never mind. The Corps of Engineers issued that determination after the court had already ruled that there were. And there's no jurisdictional issues raised by this appeal. The defendants never said to the court, you don't have jurisdiction to determine whether there are wetlands on this site. How can they do what the Corps says to restore the wetlands if the Corps says there aren't any and doesn't tell them to restore them? Your Honor, we don't know what the court would or wouldn't have said if Marina Point hadn't prepared a whole slew of new evidence, presented it to the Army Corps, and said the court's conclusion is wrong. We still say there are no wetlands. Your Honor, what you say was the violation of the injunction deserving these daily contempt penalties is sending paperwork to the Corps of Engineers. Well, yes, there are no daily penalties. All the contempt order is is it orders the defendants to file the proposed restoration plan with the court by November of 2007 or suffer penalties. They did that. It also requires them to withdraw their pending permit applications until this court rules on the correctness of the court's determination that there are wetlands on that site. Because if there are, then the Marina Point can't build in those wetlands. So there are no daily penalties. There are no ongoing penalties. The third provision of the contempt order simply says give the plaintiffs notice of their communications with the Corps. By filing the wetlands restoration plan, they avoided the financial penalties. So what's at issue in the contempt order is simply we say whether or not the order requiring them to withdraw their pending applications and requiring them to give us notice was proper. Frankly, we believe the whole wetlands issue was mooted as part of the contempt order by their filing of the restoration plan. They complied with the contempt order. This court can't really issue any further relief on that provision of the contempt order. So we don't believe that issue is live on appeal, Your Honor. Let me get back to one other point, if I may, in terms of the Corps' expertise. The only evidence before this court of the Corps' expertise is that it didn't display any here. All the Corps did is adopt Keith Merkel's report, lock, stock, and barrel. And that's what they say they did. They made one site visit. And I think part of what we claim is that the Army Corps' jurisdictional determination was not a valid subsequent action. And therefore, it can't overcome the court's judgment on the wetlands issue, which was voluntarily submitted to the court by these defendants, and shouldn't be regarded or considered as part of the issues on this appeal, Your Honor. I'm sorry, what shouldn't be? The Corps' jurisdictional determination, the legitimacy of that. See, I guess I don't really need jurisdictional determination so much as that the Corps has never said that there were any wetlands on this property. In fact, they did. In the 1991 permit, they say adjacent. Adjacent. Adjacent. And you can't put it. Adjacent is a little different from on. Adjacent is adjacent. Correct. But it said you can't fill or put structures in those wetlands, and they never did. Well, wait a minute. I still can't understand. If you've got property that's not wetlands and adjacent to the property, that means next to the property, there are wetlands. And the Corps says don't do stuff in the wetlands. I don't understand what that has to do with the land that's not wetlands. The wetlands is adjacent to the lake. And what was never made clear by the Corps is where the wetlands stopped on the site. They never delineated the wetlands. All we know is that there were adjacent wetlands and that the defendants were barred from putting fill and structures in those wetlands. But the Corps never delineated precisely where the wetlands stopped or started, and the defendants never asked them to do that before they started building, grading, and filling those wetlands. So we do know, in fact, that there were wetlands on site somewhere. Now, in fact, the defendants are claiming there are no wetlands anywhere. But there were, and that's what the Army Corps said. And, in fact, I believe it's also stated in the environmental impact statement that there are adjacent wetlands on the site. I'm still mixed up. I live on, well, what we call a ridge. You in California would call a mountain. About a mile down, there's a swamp, what you would call wetlands. So there's no precise delineation that my property is not in the swamp, though it's pretty obvious to the naked eye that it isn't. It's up on the hill. But if I understand right, you're saying that because there's a swamp about a mile down the hill, that I can't get my driveway regraded without the Corps okaying it. Even though the Corps would say, we don't have any jurisdiction over your driveway, it's not in the swamp. Well, Your Honor, in this case, the wetlands are not necessarily evident to an uninformed naked eye because they were previously graded and filled by the defendants. So what I am saying is that the Army Corps has jurisdiction over wetlands. The Army Corps delineates where the wetlands are. I may be mixed up on the history. I had the impression that years ago it was a dump, and then it was a bar and an RV park, and there was a pretty clear delineation between what was the bar and the RV park and convenience store and what was the area where reeds and water lilies and water bugs and stuff like that are. No, there was actually no competent evidence of that ever admitted at trial. Well, you can't very well have your bar and your RV park in the middle of the swamp. There's no evidence that there was a bar and RV park other than Mr. Okavita's hearsay statements, which were excluded. There was no evidence of the prior site use. No competent evidence offered or admitted at trial, Your Honor. So we don't ñ what we do know is that the wetlands may have been ñ well, they clearly were graded by Marina Point. They may have been graded by a prior owner, but the fact that the prior owner may have filled those wetlands in violation of the Clean Water Act doesn't permit the defendants to continue to do so, and that's what the case law says. So since we have no competent evidence of when the wetlands actually were first filled or by who ñ So you're saying that somebody getting their driveway graded a mile up the hill does have to apply to the Corps for a permit because there isn't any court determination that they're not in the swamp. No. The distinction here is that the Army Corps said there are adjacent wetlands, but they didn't specifically say where they stopped or started. I don't believe in your scenario the Corps has said that the swamp is wetlands or that your activities paving over the swamp would be filling the wetlands. I imagine if you wanted to pave over the swamp ñ I'm a mile uphill from the swamp. Correct. It would be impossible for me to pave the swamp, but there's no federal determination of where the swamp ends and the hill starts. You'd find out when you had to get off your bike and walk it. Correct, but there was in this case, because of, number one, the Army Corps' 1991 permit and, number two, Dr. Krantz's evidence and site inspections. It was an atypical wetlands delineation, Your Honor. All right, thank you. Thank you. Just very briefly, the original biological assessment that accompanied the 1991 project stated the following. None of this work would occur in wetlands adjacent to the lake. So I'm describing the original project. That's what it said. That's ER 1455. And then the district court issued a finding stating that, basically, the work that was performed under the ICMO and the emergency permits were done merely to advance that project, and that's ER 1141. One of the problems that I have with the district court's decision here is that it basically attacked and made findings of what the Corps did and what the Corps authorized, and it condemned the fact that the ICMO appeared to advance the original development project. And in many respects, that is indeed the case. The original development project, as authorized by the Corps, permitted the shoreline armoring with riprap, the construction of a road bench, and the construction of a trench. And the ICMO and the emergency permit after that did all of those things and basically obliterated in their footprints everything that had been done in 2003. And that was unrebutted. And turning to the 60-day letter, specifically the December 60-day letter, the 60-day letter doesn't allege an ongoing, continuing violation. The December 60-day letter basically attacks and condemns the ICMO itself. It challenges the Corps' ability to issue the ICMO in the first place, and it criticizes the activities that were authorized under the ICMO, and it suggests that the riprap construction should be scaled back from what was originally authorized by the ICMO, and it criticizes the work that had been taken to date. In fact, the 60-day notice says that the work performed under the ICMO instead has been primarily a continuation of the illegal project. So the 60-day notice did something that the citizen suit does not authorize. Sovereign immunity has never occurred. That is, you can't challenge the issuance of an Army Corps permit under the citizen suit provision of the Clean Water Act. If you want to challenge the permit, you've got to go to the Administrative Procedure Act. They didn't do that here. You heard a statement to the effect that the Corps lacks expertise and there was no evidence that the Corps did anything other than a rubber stamp. Keith Merkel's report, that's incorrect. Our reply brief in the contempt papers demonstrates and points to the record where the Corps undertook seven months of an independent review and testing and site inspection themselves. Could I ask you about something else before I forget about it? Yes. Why wouldn't they be entitled to attorney's fees for protecting the Eagle? Because when they sued you and when they won their injunction, eagles were still listed as an endangered species. We were not able to put on a case on our Endangered Species Act case. At every point we were obstructed. We were unable to cross-examine witnesses. We were unable to put on witnesses. When the court issued its findings, it issued its findings without regard to the effect of any impeachment or any cross-examination or any recantation. Virtually all of their eagle witnesses recanted and said, I'm incorrect, I didn't see eagles every day. I saw them there maybe three or four times in the past ten years. None of that made it into the findings.  The very findings that were submitted before the trial even started, those were the identical findings issued by the trial court in the end. So they're not entitled to attorney's fees because we didn't have a chance to put on our case. And their objections were frivolous throughout their case on their Endangered Species Act case. When you look at their objections and what the court sustained, they were frivolous. They should not be entitled to attorney's fees because we were not able to put on a case. So the court's kind of in a predicament here. If a case is really moot, you're faced with that. But on the other hand, we weren't able to put on a case. On the other hand, do we remand to put on a moot case to argue attorney's fees? I'd say no. Well, at least that, regardless of whether that position has merit or not, the preliminary injunction was obtained only under the ESA, not the Clean Water Act. And it carried through and would have accomplished something for the period of time, at least up through the time the judgment was entered, wouldn't it? Yeah. That would be true, Your Honor. If the court's inclined to do that, then I would invite the court to remand just for that. But I would urge the court to pick a different judge to make that determination with all due respect to the district court. I hope I've answered the court's question on that particular matter. I do have other matters, but I see a red light. Yeah. I was trying to give you a little extra time because we took a little extra time with Ms. Cohn. But your time is up. Let me ask my colleagues if they have anything else for you. Do you have anything else? Thank you very much. Thank you, Mr. Crockett. Thank you, Ms. Cohn. The matter just argued will be submitted and the court will send and process. All rise. This court session is now adjourned. Thank you.
judges: Fernandez, Rymer, Kleinfeld